UNITED STATES, Appellant

v

JAMES A. HEDGES, Private, U. S. Marine Corps, Appellee

11 USCMA 642, 29 CMR 458

No. 13,778

Decided July 8, 1960

*Major Ted H. Collins,* USMC, argued the cause for Appellant, United States.

*Lieutenant Colonel J. E. Stauffer,* USMC, argued the cause for Appellee, Accused.

## Opinion of the Court

ROBERT E. QUINN, Chief Judge:

In the early morning of October 21, 1958, the nude and mutilated body of Helen Peoples was found in an alley in Waikiki Beach, Hawaii. An autopsy showed that the decedent had been strangled to death with one of her undergarments. There were numerous bruises about the face and body and several fractured ribs and a fractured jaw. A police investigation ultimately led to the accused and he was brought to trial before a general court-martial on a charge of premeditated murder. After a trial of thirteen days the accused was found guilty of the charge and sentenced to life imprisonment and a dishonorable discharge. The conviction was affirmed by the convening authority and the record of trial was forwarded to a board of review in the West

Coast office of The Judge Advocate General.

By a divided vote, the board of review set aside the conviction. Considering a combination of two of twelve errors assigned by appellate defense counsel, a majority of the board of review concluded that the composition of the court-martial was such as to give the distinct appearance that the members were "hand-picked" by the Government. Pursuant to the provisions of Article 67 (b) (2) of the Uniform Code of Military Justice, 10 USC § 867, The Judge Advocate General of the Navy asked this Court to review the correctness of the board of review's decision. The issues upon which review is sought are as follows:

"(1) Was the Board of Review correct in ordering a rehearing as a

result of the law officer's action in denying the motion for a change of venue and the motion for a mistrial based on the voir dire examination of the members of the court;

"(2) Did the law officer abuse his discretion in admitting in evidence Prosecution Exhibits 14, 15 and 18;

"(3) Did the law officer err in refusing to instruct the court on the offense of voluntary manslaughter."

The court-martial which was convened to try the accused was composed of nine officers. The duty assignments of seven of the members were summarized by the board of review as follows:

"(1) A permanent president for the Naval District general courts-martial of about two years standing, who was likewise a qualified lawyer and past board of review member.

"(2) The Provost Marshal of the Marine Corps Air Station, Kaneohe, Oahu, T. H.

"(3) The Provost Marshal for the Naval District and the Hawaiian Sea Frontier.

"(4) The Inspector General for the Naval District and the Hawaiian Sea Frontier.

"(5) The Executive Officer of the Marine Barracks which was responsible for the operation of the brig wherein the accused was confined.

"(6) A member of an Inspection and Survey Board which operated within the command.

"(7) The Assistant for Naval Base Matters on the Naval District staff."

The remaining two members were, respectively, the Civilian Personnel Officer of Headquarters Hawaiian Sea Frontier and the Operations Officer, Fleet Weather Control.

Reviewing the effect of certain skills and duty assignments upon competency to set as a court member, the board of review below observed that this Court has previously held that neither a lawyer nor a provost marshal is *per se* disqualified. United States v Glaze, 3 USCMA 168, 11 CMR 168; United States v Stewart, 2 USCMA 78, 6 CMR 78. It extended the rationale of those cases to inspectors general, brig personnel, and "even those having assigned duties as members of the personal staffs of convening authorities."[1] However, the board of review went on to point out that this Court cautioned against the "obvious dangers" in the use of a lawyer on a court-martial, and that we emphasized that "any deviation from the limited role of member in the direction of the more stimulating position of untitled law officer" would result in disqualification and necessitate his removal. United States v Sears, 6 USCMA 661, 666, 20 CMR 377. Consideration of several matters developed in the *voir dire* of the court members led the board of review to conclude that the appearance of a hand-picked court was too strong to be ignored. We agree with the board of review. Since the circumstances speak eloquently for themselves, we think it sufficient to detail them as presented by the board of review.

"B. Among matters developed during voir dire examination of the court members, were disclosures:

"(a) That the Marine provost marshal officer, as a police officer, had read with interest newspaper reports, including a statement purportedly made by the accused, and, after having discussed the case with several officers, though no opinions were voiced; and a further statement from such member that 'one always entertains the thought, where there's smoke there's fire.'

"(b) That the Navy provost mar-

[1] We express no opinion on the validity of the board of review's conclusion. Also it is unnecessary for us to consider whether a court-martial composed entirely of personnel engaged in law enforcement work, or in staff operations for the convening authority, itself gives the appearance of a packed court. Cf. United States v Dean, 5 USCMA 44, 17 CMR 44, concurring opinion by Judge Latimer.

shal officer was in charge of the Base police, and that he had acquaintances in the Honolulu Police Department whom he met at regular monthly meetings of all Island provost marshals to which the Honolulu police (who initially investigated the case) sent representatives.

"(c) That the Inspector General admitted he was under the direct supervision of the convening authority as a 'watch dog' on the state of discipline within the command.

"(d) That one of the court members stated that if three qualified experts testified that, in their opinion, an accused was mentally competent and one such expert testified that such accused was mentally incompetent, he would apply the majority rule in weighing the evidence.

"(e) That the president of the court (a lawyer) didn't consider a plea of temporary insanity appropriate in a case involving a charge of premeditated murder, because he considered premeditated murder something that took a long time to do and temporary insanity would 'generally be out of place in an offense of that type of thing.'

"C. The president of the court [interceded, apparently as a lawyer], during voir dire examination of the members thereof, . . . [and] attempted to rehabilitate the testimony of . . . [a] member . . . in the following manner:

'LAW OFFICER: Any question by any member of the Court?

'PRESIDENT: Yes, I'd like to ask a question. You stated that when you began that you'd abide by the majority opinion of these specialists. Say that the majority opinion weren't as convincing as the minority. The minority would be overwhelmingly convincing. Would you or would you not still be bound by the majority rule? In other words, the minority man was very convincing.

'A. [Member] *The opinion has to be yes or no, you can't have any opinion maybe. So if the opinion is yes*

on the one hand and no on the other and the majority says no, I'll go with the majority.* (Emphasis supplied)

'PRESIDENT: Even in spite of the fact that the minority is better reasoned and very convincing?

'A. Now you're bringing in reasons again.

'PRESIDENT: That's exactly what I mean.

'A. If the reasons would enter into it, and the psychiatrists have gone through the same course of studies and did the same amount of years, they'd get to the reasons practically the same as everyone else does.

'PRESIDENT: Then you would not be bound by your majority?

'A. Not bound by either reasoning or majority, *but principally I'll go by the majority if the reasoning is pretty much similar.'* (Emphasis supplied)"

The first certified question is answered in the affirmative. This answer makes it unnecessary to consider the other two issues, and appellate defense counsel's motion to dismiss them because they were not passed upon by the board of review is moot. The decision of the board of review is affirmed.

Judge FERGUSON concurs.

LATIMER, Judge (concurring):

I concur.

Because there is a more fundamental issue in this case than that reached by my brothers, I prefer to file this concurring opinion. A majority of the board of review, after having observed that the record might give the impression that the members of the court were hand-picked by the Government, went on to quote this language from United States v Walters, 4 USCMA 617, 16 CMR 191:

". . . In addition to the specific prohibitions, and other regulations, set forth in the Manual for Courts-Martial and in the Uniform Code, there exist certain basic principles which underlie the conduct of trials by court-martial—or any other sort

of tribunal. Not the least of these is that the court's actions and deliberations must not only be untainted, but must also avoid the very appearance of impurity. Cf. United States v Johnson, 318 US 189, 87 L ed 704, 63 S Ct 549; United States v Atkinson, 297 US 157, 80 L ed 555, 56 S Ct 391; Ryan v United States, supra. When such an unhappy appearance is present, proper judicial administration often requires reversive action."

There can be no doubt about the fact that this record shows the appearance of impurity because significantly it presents a calculated selection of court members whose primary assignments at the time of this trial involved some aspect of crime prevention, detection or control. The preponderance of officers who were so employed is so great that any reader of the record would say candidly that the law of probability did not dictate the choice. Moreover, there is not the slightest reason advanced to support any claim that the necessities of the military service forced the convening authority to be so exclusive in selecting members for this court, which incidentally was impanelled for this hearing only. Of course, I have no way of knowing the reasons which motivated him in his preferment, but I can say that the record speaks with certainty that he did not choose a collective body of officers which was truly representative of the Naval services stationed in or near Honolulu, T. H. Absent some showing of necessity, when it appears from the record that one class most likely to lean in favor of the prosecution is favored above all others, there is substantial doubt thrown on the essential fairness of the selection processes. While not necessarily apropos because of the essential differences between the necessities of the civilian and military communities, the metaphorical argument made by appellate defense counsel suggests the reason why this record gives the appearance that the court was packed against the accused. In his oral presentation he substituted civilian occupations for similar military assignments and his mythical jury included an attorney general, a sheriff of a county, a chief of police of a city, an investigating agent for the state, and the warden of a penitentiary. With that analogy, I leave to the interested reader the question of whether the record reflects that sort of fairness which should be the hallmark of military justice.

The reason I develop with more specificity the generalization that the military judicial processes must be protected from abuses is because I believe an explicit legal error prejudicial to the accused which comes within the purview of that rule is shown by this record.

Article 25(d)(2) of the Code, 10 USC § 825, provides:

"When convening a court-martial, the convening authority shall detail as members thereof such members of the armed forces as, in his opinion, are best qualified for the duty by reason of age, education, training, experience, length of service, and judicial temperament."

Obviously that provision gives discretion to the convening authority in his selection of members, but as in every other field of law that discretion is reviewable if abused. I have no difficulty in finding an abuse of discretion in the selection of this court and I am using the term not in the sense of intentional wrong or bad faith. Legally in this setting it means no more than that the convening authority was clearly in error and used bad judgment when he failed to take into account his overweighting the court with officers whose judicial temperament and powers of arriving at a right decision would be influenced by a common mold which was shaped by their assignments in the same general field, namely, criminal enforcement.

I recognize that if each member of this court was to be isolated from the group and tested individually for qualifications, he would not be incompetent to serve on the court. Further, I am sure that each member was intellectually honest when on *voir dire* examination he asserted he would well and truly try the issue on the facts presented from the witness stand. But to my mind the

vice of the selection comes in the fact that the individual opinions of at least five members, and possibly seven, were all nurtured and fertilized in the same climate, and the zeal and fervor of one of those officers for law enforcement would in all probability be intensified by the presence of others possessing the same devotion. Of course, an accused is not entitled to be tried by individuals who have tendencies to be lenient but neither should he be judged by minions of law enforcement agencies. In that connection I might paraphrase an old saying by stating that one military policeman might not break an accused's back, but five would. And, specifically in the case at bar, while any one of the chosen officers might not discolor the essential fairness of the trial, when five to seven are coalesced into a panel of nine, the hue turns dark. It is from that point of view I find prejudicial error, for surely this record compels the inference that bad judgment and a lack of conformance with the spirit of military justice dictated the composition of this court.

One other matter impels me to make a short observation. The record shows a practice of having a senior officer who is a qualified lawyer detailed as a permanent president of the general courts-martial assembled in this particular command. That arrangement of necessity breeds trouble and disorder. In a court of that standing the law officer must be the judge, and when rank and legal knowledge in the form of a legally qualified president are superimposed over him, the probabilities are there will be encroachment into his domain. That situation is shown by this record for, as the Chief Judge points out, the president stepped into what appeared to be a breach to rehabilitate a member after some doubts arose about his qualifications to sit. This incident alone should convince Naval authorities that the plan has potentials for harm at the trial and reversals on appeal.

For the foregoing reason, I hold the law officer erred in not granting a motion for mistrial and join my brothers in their disposition.